UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES FRANCIS O'MALLEY,

                Petitioner,

        v.

JASON SCHULTZ, Acting Warden,
California State Prison at Sacramento,

                Respondent.

Case No.  4:19-CV-03872-JST

**ORDER DENYING PETITIONER'S CLAIM EIGHT (SUBCLAIM ONE), REQUEST TO SUPPLEMENT *BATSON* MERITS BRIEF, AND MOTION FOR ORDER TO ATTEND A.D.R. PROCEEDINGS**

Re: ECF Nos. 39, 50

        Petitioner has filed a brief on the merits of Claim Eight (Subclaim One) of his habeas corpus petition, alleging that the prosecutor at trial improperly exercised peremptory challenges to excuse two African American prospective jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986).  ECF No. 39.  Petitioner has also moved to supplement his brief with additional evidence and has requested an order referring the parties to settlement.  ECF No. 50.  Respondent opposes Petitioner's motions.  For the reasons outlined below, the Court **DENIES** Petitioner's petition as to Claim Eight (Subclaim One) and the associated motions.

## I.        BACKGROUND

        In 1991, a Santa Clara County jury convicted Petitioner, a member of a Hayward-based motorcycle club called the Freedom Riders, of three counts of murder for killings that took place between April 1986 and October 1987.  *People v. O'Malley*, 62 Cal. 4th 944, 954 (2016).  The three murders all had a connection to Petitioner's involvement in the motorcycle club.  Petitioner was thought to be involved in white supremacy, but no evidence of his participation in any white

1    supremacy group was presented at trial.  *Id.* at 973 n.7.

2        The California Supreme Court affirmed Petitioner's conviction and death sentence in 2016.

3    *Id.*  The state court denied his petition for a writ of habeas corpus on June 19, 2019.  *In re James*

4    *Francis O'Malley, III*, No. S187622 (Cal. June 19, 2019).  On November 2, 2020, Petitioner

5    finalized his federal habeas petition in this Court.  ECF No. 12.

6        On September 30, 2021, Petitioner filed a motion for summary judgment on Claim Eight

7    (Subclaim One).  ECF No. 30.  The Court denied that motion without prejudice and directed

8    petitioner to file a brief on the merits of Claim Eight (Subclaim One) instead.  ECF No. 38.

9    Petitioner did so.  ECF No. 39.

10       Respondent next filed a motion to dismiss Petitioner's brief on the merits of Claim Eight

11   (Subclaim One) on the grounds that it presents unexhausted facts and arguments.  ECF No. 40.

12   The Court denied Respondent's motion.  ECF No. 42.  Respondent subsequently filed a response

13   brief on the merits of Claim Eight (Subclaim One), and Petitioner filed a reply.  ECF Nos. 46 &

14   47.

15       On August 8, 2024, subsequent to a petition from the Santa Clara County District

16   Attorney's Office, the Santa Clara County Superior Court resentenced Petitioner to a life sentence

17   without the possibility of parole.  ECF No. 50 at 3-4.  That resentencing mooted Petitioner's

18   penalty-phase claims (claims thirteen through fifteen, eighteen, and nineteen), leaving the guilt-

19   phase claims (claims one through twelve, sixteen, seventeen, and twenty) before this Court.

20   Petitioner then filed a motion to supplement the brief he filed on Claim Eight (Subclaim One) with

21   statements made by the Santa Clara County District Attorney's Office during the resentencing

22   proceeding.  ECF No. 50 at 4.  Petitioner additionally asks the Court to direct the matter to

23   settlement proceedings.  *Id.*

24   **II.    LEGAL STANDARD**

25       Because Petitioner filed his habeas petition in 2020, well after the Anti-Terrorism and

26   Effective Death Penalty Act's ("AEDPA") effective date of April 24, 1996, the standards of

27   AEDPA apply to this case.  See *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).  Pursuant to

28   AEDPA, a district court may not grant a writ of habeas corpus with respect to any claim that was

United States District Court
Northern District of California

2

adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In determining whether a petitioner is entitled to relief under this provision, a federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The "contrary to" and "unreasonable application" prongs of section 2254(d)(1) have separate and distinct meanings.  See *Williams v. Taylor*, 529 U.S. 362, 404 (2000).  A state court's decision is "contrary to" clearly established United States Supreme Court law if that decision fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case but nonetheless reaches a different result.  *Id*. at 412–13.  A decision is an "unreasonable application" of United States Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  Importantly, "'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410).  A state court's determination that a claim lacks merit is not unreasonable "so long as 'fairminded jurists could disagree' on [its] correctness." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Holdings of the United States Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under section 2254(d)(1).  See *Williams*, 529 U.S. at 412; *see also Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)) ("AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by this Court, not by the courts of appeals.").  While a federal court may "look to circuit precedent to

1    ascertain whether [the circuit] has already held that the particular point in issue is clearly

2    established by Supreme Court precedent," *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per

3    curiam), "[c]ircuit precedent cannot refine or sharpen a general principle of Supreme Court

4    jurisprudence into a specific legal rule that [the Supreme] Court has not announced," *Lopez*, 574

5    U.S. at 7 (internal quotation marks omitted).

6           To find under section 2254(d)(2) that a state court's decision was based on "an

7    unreasonable determination of the facts," a federal court "must be convinced that an appellate

8    panel, applying the normal standards of appellate review, could not reasonably conclude that the

9    finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th

10   Cir. 2014) (internal quotation marks omitted), *cert. denied*, 574 U.S. 1041 (2014).  In other words,

11   "a state-court factual determination is not unreasonable merely because the federal habeas court

12   would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 18

13   (2013) (internal quotation marks omitted).  That said, "where the state courts plainly

14   misapprehend or misstate the record in making their findings, and the misapprehension goes to a

15   material factual issue that is central to petitioner's claim, that misapprehension can fatally

16   undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor*

17   *v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

18          In the event that a federal court "determine[s], considering only the evidence before the

19   state court, that the adjudication of a claim on the merits resulted in a decision contrary to or

20   involving an unreasonable application of clearly established federal law, or that the state court's

21   decision was based on an unreasonable determination of the facts," the federal court evaluates the

22   petitioner's constitutional claim "de novo." *Hurles*, 752 F.3d at 778.  If constitutional error is

23   found, however, habeas relief is warranted only if that error "had substantial and injurious effect

24   or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

25   Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they

26   are not entitled to habeas relief based on trial error unless they can establish that it resulted in

27   'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449

28   (1986)).

United States District Court
Northern District of California

### III.    DISCUSSION

#### A.    Motion to Supplement

Petitioner has requested to add into evidence the statements made by the Santa Clara County District Attorney's office regarding the District Attorney's belief that Petitioner was subject to a "'racist system of capital punishment'" and "'that implicit bias and structural racism played some role in [Petitioner's] death sentence.'" ECF No. 50 at 3 (quoting Ex. 1 at 1). Because Petitioner appears before this Court in a federal habeas posture, however, the Court is precluded from considering this evidence. The Supreme Court of the United States has clarified that the federal court's "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. The District Attorney's opinion regarding the structural racism inherent in the system of capital punishment was not presented to the California Supreme Court when it considered Petitioner's conviction and sentence on direct review and in state habeas-corpus proceedings. "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 185. This Court, therefore, may not consider any additional evidence Petitioner has put forth in support of his *Batson* claim. Petitioner's motion to supplement the record is denied.

#### B.    *Batson* Claim

Petitioner's *Batson* claim centers around the peremptory strikes the prosecutor used to remove the only two African American prospective jurors, Donald Carey ("D.C.") and Richard Allen ("R.A."), during jury selection. ECF No. 39 at 8. After Petitioner's attorney objected to the strikes "on the basis 'that the defendant is denied a representative cross-section,'" *id.* at 10, the prosecutor explained the reasons for his strikes in a sidebar before the judge. *Id.* The trial court then ruled that the reasons were valid and continued jury selection. *Id.*

In *Batson*, 476 U.S. at 89, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group would be unable impartially to consider the State's case against a black defendant." A *Batson* challenge involves a three-step inquiry. First, the trial court must determine whether the defendant has made a *prima facie* showing that the prosecutor

*United States District Court*
*Northern District of California*

exercised a peremptory challenge on the basis of race by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. *Id.* at 93-94.

Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Id.* at 97. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-78 (1995). Unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed race neutral. *Id.* A prosecutor must "state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." *Miller-El v. Dretke*, 545 U.S. 231, 250-52 (2005) ("*Miller-El II*"); *Foster v. Chatman*, 578 U.S. 488, 490, 505, 514 (2016) (Supreme Court, quoting *Miller-El II*, rejected state's explanation for striking black jurors because it "reeks of afterthought.")

Third, the court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98. "It is not until the third step that the persuasiveness of the justification becomes relevant." *Purkett*, 514 U.S. at 768. To decide whether the defendant has met his burden, the court must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93. The court has an affirmative duty to undertake the third step: to fulfill its duty, the "court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (internal quotation marks omitted).

A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2). *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013). "Thus, the state court's decision will be upheld unless it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Id.* at 1225 (quoting 28 U.S.C. § 2254(d)(2)). In evaluating *Batson* claims presented in habeas petitions, a "doubly deferential" standard applies: "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it . . . . This is because the question of

discriminatory intent largely will turn on evaluation of credibility and evaluation of the prosecutor's state of mind based on demeanor and credibility evidence lies peculiarly within a trial judge's province." *Id.* (internal quotation marks and citations omitted). "Indeed, even if '[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination.'" *Id.* at 1224 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).

Here, the California Supreme Court denied petitioner's *Batson* claim in a reasoned opinion on direct appeal. *O'Malley*, 62 Cal. 4th at 971-982. Respondent asserts that this denial was reasonable. Petitioner, however, argues that the California Supreme Court's decision was contrary to clearly established federal law, as well as an unreasonable application of clearly established federal law, and an unreasonable determination of the facts. ECF No. 39 at 12. He raises myriad allegations in connection with Claim Eight (Subclaim One). The Court addresses each in turn.

### 1.    Step Three of *Batson* Analysis

Petitioner claims that the California Supreme Court unreasonably upheld the trial Court's alleged failure to conduct a step-three analysis of his *Batson/Wheeler*[1] challenge. He contends that the trial court "never moved beyond Step 2, deciding only inherent discriminatory intent and facial validity – 'valid reasons' – and never conducted a Step 3 analysis to evaluate the persuasiveness or credibility of [the prosecutor's] proffered justifications." ECF No. 39 at 13.

The California Supreme Court addressed the events leading up to the trial judge's ruling on Petitioner's *Batson/Wheeler* challenge as follows:

> Defendant contends, as he did at trial, that the prosecutor improperly exercised two racially based peremptory challenges against African American prospective jurors, in violation of *People v. Wheeler* (1978) 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (*Wheeler*) and *Batson v. Kentucky* (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (*Batson* ). We disagree.
>
> a. Background
>
> Voir dire of the prospective jurors began on March 19, 1991. Over the

---

[1] *People v. Wheeler*, 583 P.2d 748 (1978), is California's state law analogue to *Batson*. *See Davis v. Ayala*, 576 U.S. 257, 263 (2015).

United States District Court
Northern District of California

course of the voir dire, 163 prospective jurors were questioned.

Defendant's challenge focuses on Prospective Jurors D.C. and R.A., both African American men. In his juror questionnaire, D.C. noted his father had been a police officer in Louisiana from the 1960s to the 1980s. In response to question 47, which asked about favorable or unfavorable experiences with law enforcement, he wrote "Ticket for expired liscence [sic] tags. 1 day exp [ired]." Question 55(J) asked whether the prospective juror strongly or somewhat agreed, was neutral, or strongly or somewhat disagreed with the statement: "I think that I would require that the prosecution prove its case not only beyond a reasonable doubt, as the law requires, but beyond all possible doubt and to an absolute certainty before I would convict anyone of a serious crime." D.C. checked the line for "Somewhat agree." Question 58(B) asked whether the prospective juror strongly or somewhat agreed, was neutral, or strongly or somewhat disagreed with the statement: "If someone brags about doing something wrong, he should be punished—whether or not he actually did it." D.C. checked the "Strongly disagree" line. In the space provided for an additional explanation, he wrote: "Someone could be joking around[.] [H]ow do you know if they are telling the truth."

D.C. was voir dired on April 4. The prosecutor asked if he held any grudges because he was ticketed for his expired license plate one day after the registration expired. D.C. said he did not, explaining: "It was my fault. I was one day—I was late." The prosecutor inquired whether anything about his father's career in law enforcement would make him "tend to gravitate toward one side or the other," to which he responded, "No, there isn't." The prosecutor also asked a number of other questions about his ability to be an impartial juror.

As to Prospective Juror R.A., in his juror questionnaire he checked "Strongly agree" on question 55(J), which asked whether the prospective juror would require more than proof beyond a reasonable doubt to convict. With respect to personal information, R.A. indicated in response to question 11 that, although his son lived with him, he did not know what educational level his son had completed or his occupation, if any. For hobbies, he wrote: "My hobby is amateur magic." R.A. had also been a state capitol police officer in Pennsylvania for two years.

R.A. was voir dired on April 3. In response to a question from the trial court about whether, if defendant was convicted, he could consider both life without the possibility of parole and death, R.A. answered, "Yes, but I would have to be convinced pretty well," presumably before voting for death. He went on to say, however, that he would not automatically vote for one penalty over another. During his questioning of R.A., the prosecutor focused on R.A.'s understanding of the burden of proof. With respect to R.A.'s response to question 55(J), which indicated he strongly agreed that the prosecutor would have to prove its case beyond all possible doubt, the prosecutor asked: "You recognize that that would mean that your personal standard is higher than the law requires?" R.A. answered, "No. But I just wouldn't want to have any doubt in my mind." The prosecutor read him the reasonable doubt instruction and said, "We're not talking about being convinced beyond all possible doubt. [¶] Do you see that

difference?" R.A. responded, "I see the difference, but still I just have to feel satisfied with myself that—" The prosecutor broke in, saying, "Okay. And that's understandable," but asked if R.A. could follow the law. He answered, "Well, I would be inclined to feel that I need to feel the certainty within myself, you know."

The trial court resumed questioning. To illustrate the reasonable doubt standard, it gave the example of R.A. putting his garbage out on the night before collection and returning from work to find it gone, and suggested that in this scenario there would be no reasonable doubt the garbage collectors had collected it even though it was also possible the garbage can had been knocked over and the garbage eaten by a "pack of wild dogs." The court asked, "Does that help you out at all?" R.A. replied, "Sure." The prosecutor concluded his voir dire by asking some additional questions about R.A.'s ability to be impartial.

On April 29, selection of the 12 jurors and four alternates began. Twelve prospective jurors were called to the jury box and the parties were permitted to exercise peremptory challenges. D.C. was among the first 12 prospective jurors. The prosecutor used his first peremptory challenge to excuse D.C. Both sides exercised additional peremptory challenges and additional prospective jurors were seated to replace those who had been excused. The prosecutor used his fifteenth peremptory challenge to excuse R.A. At that point, defense counsel asked for a sidebar conference to "put on the record that the district attorney has excused the second and only remaining black juror from the panel." He continued, "the defendant is denied a representative cross-section. Those were the only two black jurors in the panel out of the four panels called from this entire area. They both have been eliminated by peremptories." The prosecutor replied: "Your Honor, I would be more than happy to respond as to the reasons, but I don't think that it would be appropriate to do it here." He asked for an in camera conference. The trial court denied his request and directed him to proceed.

The prosecutor prefaced his remarks with the observation, "I think that it's interesting [defendant] is objecting is that the People have excluded the two black jurors and the People are conscientiously [sic] discriminating against a particular class. [¶ ] I think [defendant] has been involved in white supremacy. If anything, he would like not to have black members on this particular jury."[7]

Regarding D.C., the prosecutor said, "[H]e is a 33–year–old black male, married, three kids, renting. [¶ ] There were answers in his questionnaire that talked about that his father was a police officer back in the 60's. However, he recalled and spoke of the prejudice. He mentioned the license tag and so on. [¶ ] But primarily there was a question which asked how he felt about if somebody bragged about something, whether they could be punished—whether or not they actually did it. He put down in response to that, in effect, that a bragger could simply be joking about something. [¶ ] [Defendant's] defense in this particular case is that his confessing to all three murders is that he was only bragging, he was not actually telling the truth about what it was he was confessing to. And I didn't like the answer in terms of a bragger could be joking. [¶ ] In connection with the demographics in connection with some other answers, 55–J, he

was talking about strongly agreeing . . . proof should be more than beyond a reasonable doubt, to an absolute certainty."

The court then asked about R.A. The prosecutor said: "[R.A.] is a 59–year–old black male, divorced with two kids, he rents. As I indicated, the other juror is a renter. [¶ ] In terms of the demographics with not owning a home, and answer 11 on the questionnaire, the question about his children, and it was something in the answer indicating that lack of knowledge or something about certain circumstances regarding his children. [¶ ] [R.A.], for what it's worth, had a hobby as an amateur magician, which, in any event, I don't like the situation of one of the potential jurors being involved in magic, sleight-of-hand. [¶ ] He also indicated in terms of the burden of proof involved, a phrase during the voir dire where he said, 'I'd have to be convinced pretty well,' and my feeling from that was, the context of which it was said . . . something about the way that he said it in connection with the questioning that he believed that he may require burden of proof over and above what the law required. [¶ ] As far as the death penalty was concerned—and I had another note down here. My impression was he wanted more than proof beyond a reasonable doubt. [¶ ] In terms of the death penalty he was somewhat equivocal. As I recall, I summarized rather than giving him a rating on the death penalty how he felt. He was not sure of his feelings, except that he was ambivalent about that. [¶ ] And quite frankly, I would like people a little bit more, in this particular case, more indicative one way or the other how they feel about it rather than a question mark, that can't indicate how they feel about it."

At the conclusion of the prosecutor's presentation, the trial court ruled: "The court finds that the People are not intentionally excluding one class of people, and the People's reasons for exercising the peremptory challenges are valid reasons."

*O'Malley*, 62 Cal. 4th at 971-74.

Petitioner contends that after the prosecutor advanced his explanations for challenging both African American jurors, step three of the *Batson* inquiry did not occur. Petitioner alleges that this is because he was not allowed to "prove-up the discriminatory intent and pretext" advanced in the prosecutor's "Step 2 presentation" and because "the trial court never examined or evaluated the record, including the juror questionnaires or the voir dire transcript." ECF No. 39 at 13. As outlined below, Petitioner's arguments lack merit.

Petitioner misapprehends what happens at the third step of the *Batson* inquiry. He argues that a court must allow defense counsel to present argument at this juncture. ECF No. 39 at 12. That is not the case. During the third step, the trial court determines "if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. At this step, the trial court

evaluates the persuasiveness of the prosecutor's justification. *Rice*, 546 U.S. at 338. "In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008) (internal quotation marks omitted). In *Lewis v. Lewis*, 321 F.3d 824, 831, 831 n. 27 (9th Cir. 2003), the Ninth Circuit observed that a court "may enlist the help of counsel in order to evaluate 'the totality of the relevant facts' thoroughly," but also recognized that "requiring a court to allow defense counsel to argue is not clearly established law." As such, the California Supreme Court decision upholding the trial court's *Batson* ruling rendered without defense argument at the third step of its inquiry did not constitute an unreasonable application of clearly established law.

Petitioner next argues that the trial court "never conducted a Step 3 analysis to evaluate the persuasiveness or credibility" of the prosecutor's justifications. ECF No. 39 at 13. He alleges that the California Supreme Court unreasonably failed to correct this departure from established precedent, and instead, mistakenly mischaracterized the trial court's "Step 2 finding as a Step 3 evaluation of the record." *Id*.

Petitioner misreads the California Supreme Court's opinion. After the prosecutor presented his justifications, the trial court ruled: "The court finds that the People are not intentionally excluding one class of people, and the People's reasons for exercising the peremptory challenges are valid reasons." *O'Malley*, 62 Cal. 4th at 974. Referring to this ruling, the California Supreme Court stated: "after the prosecutor gave his reasons for excusing the prospective jurors, the court found those reasons to be credible." *Id*.

The California Supreme Court did not conflate steps two and three of the *Batson* analysis. Under *Batson*, there is no requirement that a trial court describe its step-three analysis on the record, "only that it . . . undertake such an analysis." *Green*, 532 F.3d at 1030 n. 2 (internal quotation marks omitted). The Ninth Circuit has declined to state "what specific procedures a trial court must follow at step three," *United States v. Alanis*, 335 F.3d 965, 968 n.2 (9th Cir. 2003), and has noted that a trial court need not use all its tools for evaluating the validity of a prosecutor's reasons. *Lewis*, 321 F.3d 834; *but see Alanis*, 335 F.3d at 969 (step-three analysis inadequate

United States District Court
Northern District of California

where trial court summarily denied *Batson* motion based on prosecutor's "plausible explanation" for peremptory challenges); *Lewis*, 321 F.3d. at 832 (holding that trial court did not fulfill its step-three duty when it concluded that prosecutor's stated reason for striking potential African American juror was "probably . . . reasonable.")  Here, the trial court issued its ruling by unequivocally stating that "[t]he court finds that the People are not intentionally excluding one class of people, and the People's reasons for exercising the peremptory challenges are valid reasons."  *O'Malley*,  62 Cal. 4th at 974.  It did so after considering the justifications advanced by the prosecutor, a key method of evaluating discriminatory intent.  *See Snyder v. Louisiana*, 552 U.S. 472. 477 (2008) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)) ("'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge.'"); *see also Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) ("*Miller-El I*") (findings on issue of discriminatory intent will turn on "evaluation of credibility."); *United States v. Tirouda*, 233 F. App'x. 744, 746 (9th Cir. 2007) ("[W]hether a *Batson* challenger prevails at the third stage of the analysis depends in large measure on the trial court's assessment of prosecutorial credibility.")  In reviewing the trial court's ruling, the California Supreme Court reasonably determined that the trial court had found the prosecutor's reasons to be credible at the third step of the *Batson* inquiry.  *O'Malley*, 62 Cal. 4th at 974.  Petitioner fails to demonstrate that the California Supreme Court's application of *Batson*'s framework was objectively unreasonable or contrary to established Supreme Court precedent.

Even assuming, *arguendo*, that the trial court did not conduct an adequate step-three analysis, the California Supreme Court remedied any trial-court error by conducting a thorough comparative juror analysis on direct appeal and finding no evidence of discriminatory intent.  *Cf. Green*, 532 F.3d at 1031 (by failing to conduct comparative juror analysis, California Court of Appeal did not remedy the trial court's error in not reaching step three of *Batson* inquiry).  Indeed, the California Supreme Court framed its sole issue on appeal to be "whether the trial court correctly ruled that the defense did not satisfy its burden of demonstrating discriminatory motivation at the third stage of the *Batson* inquiry."  *O'Malley*, 62 Cal. 4th at 975.  Petitioner, however, takes issue with the comparative juror analysis that the California Supreme Court

undertook to answer this question.  His arguments are addressed below.

### 2.    California Supreme Court's Comparative Juror Analysis

Petitioner alleges that the comparative juror analysis conducted by the California Supreme Court on direct appeal was contrary to *Miller-El II* because it "improperly substituted peremptory reasons not presented by the DA."  ECF No. 39 at 16.  Under *Miller-El II*, if a prosecutor's stated reason does not hold up, "its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." 545 U.S. at 252.  Petitioner alleges that the prosecutor did not mention D.C.'s responses to juror questionnaire questions numbers 60, 61, 62, and 68, regarding the death penalty as a basis for striking D.C., ECF No. 39 at 16, and yet the California Supreme Court compared D.C.'s responses to these questions to the responses of two seated jurors, L.R. and M.A.S., in explaining their attractiveness as jurors. *O'Malley*, 64 Cal. 4th at 977.

Petitioner misreads the state court's opinion.  The California Supreme Court examined D.C.'s responses to questions number 60, 61, 62, and 68 not to substitute its own reasons for those advanced by the prosecutor, but as part of its comparative analysis.  Because the trial court did not conduct a comparative juror analysis, the California Supreme Court conducted such an analysis for the first time on direct appeal.  *O'Malley*, 62 Cal. 4th at 976-982.  The state court explained that "[w]here, as here, the comparative analysis was not made at trial, the prosecutor generally has not provided, and was not asked to provide, an explanation for non-challenges." *Id*. at 976 (internal quotation marks omitted).  The court further noted that "the prosecutor was not given the opportunity to explain his reasons for dismissing D.C. while later retaining L.R. and M.A.S. Under these circumstances, we have said that 'a reviewing court need not, indeed, must not turn a blind eye to reasons the record discloses for not challenging other jurors even if those other jurors are similar in some respects to excused jurors.'" *Id*. at 977 (quoting *People v. Jones*, 51 Cal. 4th 346, 365-66 (2011)).  The California Supreme Court then proceeded to examine the responses of L.R. and M.A.S. to questions about the death penalty.  It explicitly acknowledged that the prosecutor had not expressed any concern about D.C.'s views of the death penalty but reasoned that because the responses of L.R. and M.A.S. were more favorable to the prosecution, they were

13

more favorable jurors for a prosecutor seeking the death penalty than D.C., whose responses were more neutral. *Id.* at 979. In conducting its analysis, the California Supreme Court thus heeded the directive of *Jones,* 51 Cal. 4th at 365, to identify possible reasons for the prosecutor's "non-challenges."

In sum, the California Supreme Court examined D.C., L.R. and M.A.S.'s responses to questionnaire questions about the death penalty not to substitute its own reasons for the prosecutor's peremptory challenges, but rather to conduct a comparative juror analysis to determine whether the trial court correctly ruled that the defense did not satisfy its burden of demonstrating discriminatory motivation at the third step of the *Batson* inquiry. Petitioner fails to demonstrate that the California Supreme Court's decision constituted an unreasonable application of *Miller-El II* or any other clearly established United States Supreme Court law.

### 3.    California Supreme Court's Factual Determinations

Petitioner alleges that the California Supreme Court's decision on direct appeal deserves no deference because it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Under the AEDPA, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Briggs*, 682 F.3d at 1171; 28 U.S.C. § 2254which(1) (requiring "clear and convincing evidence" to rebut "a determination of a factual issue made by a State court.")

Petitioner alleges that the state court unreasonably determined facts in the instances outlined below.

#### a.    Evidence of Santa Clara County's Jury Selection Practice

Petitioner alleges that the California Supreme Court's denial of his *Batson* claim constituted an unreasonable determination of the facts because it ignored evidence that Santa Clara County employed a jury selection practice that provided an opportunity for racial discrimination. He asserts that because Santa Clara County's African American population in 1990 was 3.7% of its total population, having twelve African American prospective jurors would be consistent with this data. Petitioner's qualified venire, however, had only two African Americans. ECF No. 39 at 17.

Petitioner's argument is premised on census data that this Court has previously determined is not properly before it because that data has not been reviewed by the state court.  ECF No. 42 at 7-8; *Pinholster*, 563 U.S. at 181.  In his reply, Petitioner contends that his argument relies on additional statistical evidence, including evidence that "there were only two unexcused blacks in [Petitioner's] venire out of 308 people (.06289%)."  ECF No. 47 at 9.  To the extent that this statistic raises an inference of bias, this inference was refuted by the California Supreme Court's analysis and determination that the trial court properly denied Petitioner's *Batson/Wheeler* motion. *See O'Malley*, 62 Cal. 4th at 982; *cf. Williams v. Runnels*, 432 F.3d 1102, 1109 (9th Cir. 2006) (review of record fails to disclose refutation of the inference of bias raised by statistical disparity). Petitioner's allegations do not provide clear and convincing evidence to disturb the state court's findings.  *See* 28 U.S.C. § 2254which(1).

**b.    Evidence of a Pattern of Strikes Against African American Jurors**

Petitioner alleges that the California Supreme Court's decision was based on an unreasonable determination of the facts because it ignored evidence of a pattern of strikes against African American jurors that gave rise to an inference of discrimination.  Petitioner contends that the prosecutor's eagerness to strike African American jurors was evidenced by the timing of his challenges: he used his very first peremptory challenge to strike D.C., the son of a police officer, and then used a peremptory challenge to strike R.A., a former police officer, despite the fact that other objectionable jurors were already seated.

Petitioner's arguments are unavailing.  After extensively reviewing the record of voir dire and conducting a comparative analysis, the California Supreme Court held that the trial court properly concluded that the prosecutor's reasons for using peremptory challenges to excuse jurors D.C. and R.A. were not race-based.  *O'Malley*, 62 Cal. 4th at 971-982.  The record adequately supports the California Supreme Court's conclusion.  Petitioner's allegations regarding the timing of the prosecutor's strikes do not provide clear and convincing evidence to disturb the state court's findings.  *See* 28 U.S.C. § 2254which(1).

**c.    Evidence that the Prosecutor "Failed to Provide Clear and**

**Specific Reasons for Peremptory Challenges"**

Petitioner next claims that the California Supreme Court ignored obvious evidence in the record showing that the prosecutor failed to provide clear and specific explanations for his peremptory challenges.  ECF No. 39 at 19.  He asserts that the prosecutor's shortcoming is evidence of pretext.  Respondent counters that the California Supreme Court reasonably found the prosecutor's reasons to be legitimate rather than pretextual.

Under *Batson*, a prosecutor must give a "clear and reasonably specific explanation" of legitimate reasons for exercising peremptory challenges.  476 U.S. at 98 n. 20.  To satisfy this burden of production, the prosecutor must do more than merely deny a discriminatory motive or affirm good faith.  *Elem*, 514 U.S. at 768.  The prosecutor must offer a legitimate reason, which is "not a reason that makes sense, but a reason that does not deny equal protection."  *Id.*  Indeed, a prospective juror "may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons."  *People v. Lenix*, 44 Cal. 4th 602, 613 (2008).

Here, the prosecutor met his burden in providing explanations for his challenges.  In justifying his challenge of D.C., he stated that his primary reason was D.C.'s response to question 58(B), in which D.C. stated that a bragger should not be punished for bragging about doing something because it is possible that the bragger was just joking.  The prosecutor stated that he did not like this response and noted that Petitioner's anticipated defense in fact was that his confessions were just incidents of bragging.  AG019229-AG0192330.  The prosecutor further cited D.C.'s response to question 55(J), in which D.C. somewhat agreed that the prosecution should be held to a standard of proof higher than reasonable doubt.  AG019230.  The prosecutor also alluded to Petitioner's mention of "the license tag," referring to Petitioner's response to a question on the jury questionnaire about unfavorable experiences with law enforcement, in which Petitioner stated that he was once ticketed for an expired license plate one day after the registration expired.  AG019229.

With respect to R.A., the prosecutor cited R.A.'s lack of knowledge about his children, his hobby of being an amateur magician and involvement in the "sleight of hand," his answer regarding the prosecution's burden of proof suggesting a standard higher than what the law

1    requires, and R.A.'s equivocal attitude towards the death penalty.  AG019230-AG019231.

2    Contrary to Petitioner's contentions, the reasons cited by the prosecutor were clear and specific.

3                    **d.    Evidence of Prosecutor's Misrepresentation of the Record**

4            Petitioner alleges that the California Supreme Court ignored evidence that the

5    prosecutor made misstatements and misrepresented the record when he offered his reasons for

6    striking D.C. and R.A.  ECF No. 39 at 22.  He asserts that this misrepresentation is evidence of

7    pretext.  *See Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (if review of the record

8    undermines prosecutor's stated reasons, the reasons may be deemed pretextual.)  Respondent

9    counters that the California Supreme Court reasonably attributed the misstatements to the

10   prosecutor's attempt to reconstruct voir dire that had taken place weeks prior.

11           Petitioner asserts that the prosecutor misrepresented the record in numerous instances.

12   Each instance shall be addressed in turn.

13           First, in advancing his reasons for striking D.C., Petitioner asserts that the prosecutor

14   wrongly stated that D.C. "recalled and spoke of prejudice."  ECF No. 39 at 22.  The California

15   Supreme addressed this misstatement as follows:

16                  Defendant is correct that D.C. did not speak of prejudice in either his
                    questionnaire or at voir dire, but the prosecutor's mistaken
17                  recollection that he had done so does not establish that the prosecutor
                    was acting with discriminatory purpose. The prosecutor was
18                  attempting to reconstruct the voir dire of a juror that had taken place
                    more than two weeks earlier, in the midst of a voir dire process that
19                  had lasted almost a month, over the course of which 163 prospective
                    jurors were questioned. His brief, passing reference to prejudice was
20                  linked to D.C.'s written response to the question on the jury
                    questionnaire asking about unfavorable experiences with law
21                  enforcement, in which D.C. noted he had been cited for an expired
                    registration only one day after the license plate tag had expired. The
22                  prosecutor questioned D.C. about the incident and, while D.C. said he
                    held no grudge against the officer who had cited him, evidently the
23                  prosecutor disbelieved that assurance.

24                  The prosecutor, unlike this court, not only heard D.C.'s words, but
                    heard his tone of voice and observed his body language as he denied
25                  bearing a grudge against the officer who had cited him. "'On appellate
                    review, a voir dire answer sits on a page of transcript. In the trial court,
26                  however, advocates and trial judges watch and listen as the answer is
                    delivered. Myriad subtle nuances may shape it, including attitude,
27                  attention, interest, body language, facial expression and eye contact.'"
                    (*People v. Jones*, supra, 51 Cal.4th at p. 363, 121 Cal.Rptr.3d 1, 247
28                  P.3d 82.) Even if the prosecutor's concern about the citation,

considered in isolation, might not provide a compelling reason for a peremptory challenge, the prosecutor's mistaken reference to prejudice alone does not establish that the prosecutor's stated reasons were pretexts for discrimination. (*See People v. Williams* (2013) 56 Cal.4th 630, 661, 156 Cal.Rptr.3d 214, 299 P.3d 1185 [no *Batson* violation when the prosecutor excused a prospective juror for a factually erroneous but race-neutral reason]; *People v. Williams* (1997) 16 Cal.4th 153, 189, 66 Cal.Rptr.2d 123, 940 P.2d 710 ["a genuine 'mistake' is a race-neutral reason"].)

*O'Malley*, 62 Cal. 4th at 979.

As the California Supreme Court points out, the prosecutor was reconstructing D.C.'s voir dire, which had taken place over two weeks prior to the *Batson* challenge, during a voir-dire process that involved the questioning of 163 prospective jurors. Contrary to Petitioner's assertion, the California Supreme Court's attribution of the prosecutor's misstatements to the time lapse between the D.C.'s voir dire and the *Batson* motion, as well the large number of prospective jurors questioned, was reasonable. *See Flowers v. Mississippi*, 588 U.S. 284, 314 (2019) ("[T]he back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations"); *Rice*, 546 U.S. at 340 ("Seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible"); *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013) ("*Batson* prohibits purposeful discrimination, not honest, unintentional mistakes.")

Petitioner further asserts that the prosecutor wrongly attributed to D.C. the position that he "strongly agreed" that the prosecutor's standard of proof "should be more than beyond a reasonable doubt, to an absolute certainty." ECF No. 39 at 22. D.C.'s questionnaire, however, indicated that he "somewhat agreed" with this standard of proof. *Id*. Although the California Supreme Court did not explicitly recognize this misstatement, in conducting its comparative juror analysis, it cited the correct information. *O'Malley*, 62 Cal. 4th at 977-978. It noted that, unlike D.C., who "somewhat agreed" with holding the prosecutor to a higher standard, two other jurors "somewhat disagree[d]" and "strongly disagree[d]" with this standard. *Id*. The court observed that the prospective jurors' attitudes towards this standard were an important consideration for the prosecution. *Id*.

With respect to R.A., Petitioner asserts that the prosecutor stated that R.A. had "two kids,"

18

1    whereas he in fact had just one son.  ECF No. 39 at 22.  The number of children R.A. had was

2    immaterial – rather, the prosecutor took issue with R.A.'s lack of knowledge about his children – a

3    reason that Petitioner conceded was race-neutral and supported by the record.  *O'Malley*, 62 Cal.

4    4th at 981.

5         Finally, Petitioner asserts that the prosecutor stated that R.A. was equivocal about the

6    death penalty, whereas the record showed otherwise.  ECF No. 39 at 22.  He further claims that the

7    prosecutor stated that R.A. "wanted more proof than beyond a reasonable doubt," whereas the

8    record again showed otherwise.  *Id.*  Petitioner, however, conceded on direct appeal that these

9    justifications were race-neutral and supported by the record.  *O'Malley*, 62 Cal. 4th at 981.  A

10   review of the record supports the prosecutor's justifications.  AG017731- AG017744.  Petitioner

11   fails to demonstrate that these justifications were pretextual.

12         **e.    Evidence of Prosecutor's Reliance on "Renter Demographics"**

13        Petitioner claims that the prosecutor's reliance on the fact that D.C. and R.A. rented homes

14   as a reason for striking them was pretext for racial discrimination because he did not strike five

15   non-black seated jurors who were also renters.  ECF No. 39 at 23.  In support of this argument, he

16   offers statistics and census data to compare the frequency of renting among people of different

17   races.  *Id.* at 24.  Because Petitioner did not present this data to the state supreme court for its

18   consideration, this Court may not consider it.  ECF No. 42 at 7-9; *Pinholster*, 563 U.S. at 181.

19   Even assuming, *arguendo*, that the Court could consider the statistics, they do not support his

20   argument.  As explained *infra*, the state supreme court's interpretation of the prosecutor's

21   comments regarding renting and other "demographics" as descriptive was not an unreasonable

22   determination of the facts; Petitioner has not proven that those comments were pretextual reasons

23   to cover a discriminatory strike.

24         **f.    Comparative Juror Analysis**

25         **(1)    "Descriptive" Justification**

26

27        Petitioner argues that the California Supreme Court made an unreasonable determination

28   of the facts when it ignored evidence in the record demonstrating that the prosecutor's recitation of

United States District Court
Northern District of California

1    various characteristics of D.C. and R.A., particularly their status as renters, was not descriptive but

2    instead served as pretextual reasons masking discriminatory intent.  Respondent contends that the

3    record does not support Petitioner's argument.

4        To the extent that Petitioner alleges that the California Supreme Court unreasonably

5    determined that the prosecutor's mention of D.C.'s status as a renter was merely descriptive, his

6    allegations are unfounded.  The California Supreme Court determined that "read in context, the

7    prosecutor's reference to D.C.'s status as a renter, along with his marital and parental statuses,

8    were descriptive and not reasons for his challenge." *O'Malley*, 62 Cal. 4th 976 n.8.  The record

9    supports this determination.  In addressing his challenge of D.C., the prosecutor began by stating:

10   "[h]e is a 33-year-old black male, married, three kids, renting." AGO19229.  He then provided

11   three reasons for the strike: D.C.'s mention of the license tag incident, his bragging answer, and

12   his position on the burden of proof.  AGO19229-AG019230.  A straightforward reading of the

13   prosecutor's statements suggests that he was simply reminding himself and the court of the juror

14   in question by describing him.  Read in context, the prosecutor's reference to "renting" is clearly

15   descriptive in nature.

16       To the extent that Petitioner alleges that the California Supreme Court unreasonably

17   determined that the prosecutor's mention of R.A.'s renter status was descriptive, his allegations

18   are again unfounded.  In addressing Petitioner's allegations on direct appeal, the California

19   Supreme Court stated:

20           When asked about R.A., the prosecutor prefaced his remarks by
             noting, "[R.A.] is a 59–year–old black male, divorced with two kids,
21           he rents. As I indicated, the other juror is a renter." Defendant seizes
             upon the italicized phrase, which evidently refers to D.C., as proof
22           that R.A.'s renter status was advanced as a justification for the
             peremptory challenge. But the prosecutor did not cite that as a reason
23           for his challenge to D.C. Moreover, unlike his other reasons for
             challenging R.A., the prosecutor said nothing more about his renter
24           status as a justification for the challenge. Although his comment that
             R.A. was a renter was admittedly somewhat ambiguous, we construe
25           it as descriptive, not as a justification for the challenge.

26   *O'Malley*, 62 Cal. 4th at 981.  The record supports the California Supreme Court's determination

27   that the reference to renting was descriptive.  AG019230.  When read in context, it is apparent that

28

the prosecutor's comment was meant merely to provide a descriptive identifier and not a justification for the peremptory strike.

Finally, Petitioner fails to demonstrate that the California Supreme Court made unreasonable factual determinations by allegedly ignoring evidence demonstrating that the prosecutor's recitation of various other characteristics of D.C. and R.A. were pretextual. When the prosecutor's explanations for the strikes of both jurors are read as a whole, it appears that he indeed provided a descriptive introduction of each juror before he outlined his reasons for excluding them. AG019229-31. Petitioner's contentions to the contrary lack merit.

### (2)    "Bragging" Justification

Petitioner next alleges that the California Supreme Court's comparative juror analysis comparing D.C.'s response to question 58(B) of the juror questionnaire, which pertained to bragging, to the responses of other jurors who gave similar responses, was deficient. ECF No. 39 at 27. The prosecutor explained that he excused D.C. primarily because of his response stating that he strongly disagreed with the proposition that someone should be punished simply for bragging about having done something. AG019229-30. Petitioner contends that this explanation applied equally to other jurors who gave similar answers but were not stricken. He argues that the California Supreme Court unreasonably found no pretext for the prosecutor's strike of D.C..

Question 58(B) asked the prospective jurors to rate how strongly they agreed or disagreed with the statement, "If someone brags about doing something wrong, he should be punished—whether or not he actually did it." AG008518. D.C. checked the line stating that he "Strongly Disagree[d]" with the statement and added a written explanation: "Someone could be joking around. How do you know if they are telling the truth?" *Id.*

In providing reasons for his strike of D.C., the prosecutor indicated that this statement was a primary reason. He stated:

> But primarily there was a question which asked how he felt about if somebody bragged about something, whether they could be punished—whether or not they actually did it. He put down in response to that, in effect, that a bragger could simply be joking about something.
>
> Mr. O'Malley's defense in this particular case is that his confessing

1    to all three murders is that he was only bragging, he was not actually
telling the truth about what it was he was confessing to.  And I didn't
2    like the answer in terms of a bragger could be joking.

3    AG019229-30.

4         On direct appeal, the California Supreme Court conducted a comparative analysis

5    comparing D.C.'s answers to the answers of two other seated jurors, L.R. and M.A.S., who

6    similarly to D.C., checked the "strongly disagreed" response to question 58B.  *O'Malley*, 62 Cal.

7    4th at 976-979.  Although twelve of the seated jurors and alternates also checked the same

8    "strongly disagreed" line, L.R. and M.A.S., like D.C., provided additional written explanations for

9    their responses.  The California Supreme Court limited its comparison to L.R. and M.A.S. for this

10   reason.  *Id*. at 976.  L.R.'s additional explanation stated: "bragging is just talking, not committing

11   a crime," and M.A.S.'s explanation stated: "[p]eople say a lot of things that they often don't mean

12   or to show off for others."  *Id*. at 977.  Given the prosecutor's focus on D.C.'s explanation of his

13   answer to question 58(B) - namely that a bragger could be joking - the state court's limitation of

14   its analysis to jurors who similarly provided additional explanations for their answers was not

15   unreasonable.

16        In comparing D.C. to L.R. and M.A.S., the California Supreme Court proceeded to

17   determine that their answers to questions regarding their feelings about the death penalty and the

18   applicable burden of proof made them more appealing to the prosecutor than D.C..  *Id*. at 977-979.

19   In particular, while D.C. "somewhat agreed" that the prosecution should be held to a higher

20   standard of proof than beyond a reasonable doubt, L.R. "somewhat disagreed" with this

21   proposition and M.A.S. "strongly disagreed" with it.  *Id*. at 977-978.  Accordingly, the California

22   Supreme Court reasonably determined that L.R. and M.A.S. were more appealing overall as

23   jurors, and the prosecutor's stated reasons for striking D.C. were not pretextual.

24        **(3)    Carey's Father's Employment as a Police Officer**

25        Petitioner contends that the prosecutor justified his strike of D.C. by citing D.C.'s father's

26   employment history as a police officer, even though three seated jurors also had relatives in law

27   enforcement.  ECF No. 39 at 28-29.  He argues if the California Supreme Court had conducted a

28   proper comparative juror analysis, the pretextual nature of this justification would have come to

United States District Court
Northern District of California

1   light.

2          Contrary to Petitioner's contention, the prosecutor did not cite D.C.'s father's employment

3   history as police officer as a justification for his peremptory strike.  Rather, the prosecutor

4   mentioned "answers in [D.C.'s] questionnaire that talked about that [SIC] his father was a police

5   officer back in the  60's" in an apparent attempt to reconstruct D.C.'s voir dire, which had taken

6   place several weeks prior.  AG019229.  Even assuming that the prosecutor had cited D.C. father's

7   employment history as a police officer as a justification, the California Supreme Court took note

8   of this employment when it compared D.C. to M.A.S., whose father had been a Fresno County

9   District Attorney for seventeen years and other family members also had law enforcement ties.

10  *O'Malley*, 62 Cal. 4th at 979.  The court concluded that the nature and extent of M.A.S.'s ties to

11  law enforcement differentiated M.A.S. from D.C., presumably making M.A.S. a better juror for

12  the prosecution.  *Id*.  The California Supreme Court thus did take note of D.C. father's

13  employment as a police officer in the course of its comparative juror analysis.  Petitioner's

14  argument that the California Supreme Court unreasonably omitted Petitioner's father's

15  employment history from its comparative juror analysis is unavailing.

16                    **(4)    Allen's Feelings about the Death Penalty**

17         Petitioner alleges that the California Supreme Court failed to conduct a proper comparative

18  juror analysis that would have revealed that the prosecutor's strike of R.A. based on his opinions

19  regarding the death penalty was pretextual.  Petitioner is mistaken. On direct appeal, the California

20  Supreme Court noted that Petitioner conceded that R.A.'s "ambivalence on imposing the death

21  penalty" was a race-neutral reason for the peremptory strike and was supported by the record.

22  *O'Malley*, 62 Cal. 4th at 981.  The state court, therefore, had no reason to make a comparison with

23  any other jurors regarding their opinions about the death penalty.

24                    **(5)    Other Misstatements of the Record.**

25         Finally, Petitioner claims that in conducting its comparative juror analysis, the California

26  Supreme Court misstated the record.  ECF No. 39 at 29-30.  He asserts that the court stated that

27  only two of the seated jurors, L.R. and M.A.S., added written explanations to their answers to

28  question 58(B) regarding bragging, whereas the record shows otherwise.  He points out that seated

United States District Court
Northern District of California

juror number nine also added a written explanation to her response to question 58(B), stating: "[m]ost children go through a stage when this comes up. Most of them [illegible]." *Id.* at 30. He further adds that seated juror number seven "strongly disagreed" that braggers should be punished and "strongly agreed" that the prosecution should prove its case beyond all possible doubt. *Id.* Petitioner argues that these errors render the state court decision unreasonable.

The Court is not persuaded. Although juror number nine added a written explanation to her response, she also stated that she was "neutral" on the issue of whether someone should be punished for bragging about doing something wrong, whether or not they "actually did it." AG006356. This differentiates her from D.C., L.R., and M.A.S., all of whom "strongly disagreed" with this proposition. Moreover, although juror number nine elaborated on her response, her elaboration related to children's developmental stages, not to any inferences of guilt from bragging. Juror number seven, in turn, who "strongly disagreed" that braggers should be punished, did not provide an additional written explanation to her response, so her inclusion would not have contributed in a meaningful way to the state court's comparative juror analysis.

Petitioner has not provided clear and convincing evidence to support his argument that the California Supreme Court made an unreasonable determination of the facts in its evaluation of his claims. The Court sees no reason to disturb the state court's factual findings. *See* 28 U.S.C. § 2254(e)(1).

## CONCLUSION

For the foregoing reasons, Subclaim One of Claim Eight in Petitioner's petition for a writ of habeas corpus (ECF No. 12) is **DENIED**. Likewise, Petitioner's Status Report and Request to Supplement Batson Merits Brief and for Order to Attend A.D.R. Proceedings (ECF No. 50) is **DENIED**. The parties are directed to confer and submit a joint statement outlining a briefing schedule for the remaining claims in the petition within 60 days of this Order.

**IT IS SO ORDERED.**

Dated: September 16, 2025

_____
JON S. TIGAR
United States District Judge